UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KATHLEEN A. THOMAS, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. |
| CITIMORTGAGE, INC.; FLAGSTAR ) | 12-40122-FDS |
| BANK, FSB; and ALLIED MORTGAGE ) | |
| CAPITAL CORPORATION, ) | |
| ) | |
| Appellees. ) | |

MEMORANDUM AND ORDER
ON APPEAL FROM BANKRUPTCY COURT

**SAYLOR, J.**

This is an appeal from an order of dismissal of the United States Bankruptcy Court for the District of Massachusetts. After confirmation of her Chapter 13 plan, debtor Kathleen Thomas sought to challenge the validity of the mortgage on her home by instituting an adversary proceeding. The Bankruptcy Court dismissed the proceeding on the basis that the state law violations alleged were preempted by federal law.

For the reasons set forth below, the order of the Bankruptcy Court will be affirmed.

**I.   Jurisdiction and Standard of Review**

This Court has jurisdiction to hear appeals from final judgments, orders, and decrees of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). In reviewing the Bankruptcy Court's decision, this Court functions as an appellate court and is authorized to "affirm, modify, or reverse a bankruptcy judge's [order] or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. The Bankruptcy Court's conclusions of law are reviewed *de novo*; its

findings of fact are reviewed for clear error. *See Stornawaye Fin. Corp. v. Hill (In re Hill)*, 562 F.3d 29, 32 (1st Cir. 2009) (citing *In re Healthco Int'l, Inc.*, 132 F.3d 104, 107 (1st Cir. 1997).

## II. Background

### A. Factual Background

Unless otherwise noted, the following facts are drawn from the Bankruptcy Court's findings of fact in *Thomas v. CitiMortgage, Inc. (In re Thomas)*, 476 B.R. 691 (Bankr. D. Mass. 2012) ("Thomas II").[1]

In 1994, Kathleen Thomas purchased a home in Worcester, Massachusetts, with a purchase-money mortgage. (App. to Appellant's Br. at 368). In 2006, she contacted Allied Mortgage Capital Corporation to refinance the mortgage. Allied arranged for the loan to be made through Flagstar Bank. On April 19, 2006—in keeping with industry practice when a prospective borrower has locked in an interest rate in connection with a loan application—Flagstar issued a "Rate Lock Confirmation" to Allied for the refinancing. This served to "lock" her interest rate for the loan for thirty days. The notice indicated that the loan was to be closed in Allied's name.

As set forth by the Bankruptcy Court:

> By a "Purchase Commitment Letter" dated May 4, 2006, written on Flagstar's letterhead, Flagstar informed Ms. Thomas that the proposed refinancing met the requirements for Flagstar to purchase the loan subject to certain conditions set forth in the letter. Among the conditions were that Flagstar Bank was to receive the first and only lien on Ms. Thomas' property, that title insurance had to be received by Flagstar prior to the closing, that Ms. Thomas' hazard

---

[1] Thomas disputes many of the facts presented here, as she did below. In most instances, Thomas either does not cite to any evidence, or cites only to her own testimony. In none of those instances has she presented any evidence that the Bankruptcy Court's findings of fact represent clear error. Accordingly, the Court notes that Thomas disagrees with the facts as found by the Bankruptcy Court, but will not address that disagreement further.

> insurance policy was to name Flagstar and its successors and assigns as beneficiaries and be issued by an insurance company acceptable to Flagstar, and that '[t]his loan is to be closed on a MERS Security Instrument.' . . . Based on the Purchase Commitment Letter and the Rate Lock Confirmation, Allied is referred to as both the originator and broker of the loan and the terms are used interchangeably.

*Thomas II*, 476 B.R. at 692-93.

The loan closed on May 8, 2006. Thomas executed a $153,000 promissory note payable to Allied, secured by a mortgage in favor of Mortgage Electronic Registration System as nominee for Allied and its successors and assigns. That same day, Allied executed a letter notifying Thomas that the servicing of her loan was being assigned or transferred to Flagstar. Four days later, on May 12, 2006, Flagstar wired $148,763.18 to Citizens Bank of Rhode Island, the entity that held the prior mortgage that was paid off through the refinancing.

Flagstar took physical possession of the note on May 15, 2006. According to a notation on the note itself, it was assigned without recourse from Allied to Flagstar. Thomas's first loan payment was due to Flagstar. (App. to Appellant's Br. at 487).

### B. Procedural Background

On September 12, 2006, CitiMortgage took physical possession of the note. Thomas eventually fell behind in her mortgage payments, and CitiMortgage began foreclosure proceedings. On February 2, 2010, Thomas filed a petition in the United States Bankruptcy Court for the District of Massachusetts for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

On June 2, 2010, Thomas brought an adversary proceeding against Allied, Flagstar, and CitiMortgage. The proceeding sought relief for alleged violations of special protections imposed

by the Massachusetts legislature in connection with high-cost loans, *see* Mass. Gen. Laws ch. 183C, and a declaration that CitiMortgage could not assert a secured claim in her case. Defendants moved for summary judgment on the basis that the Massachusetts statutory protections were preempted by federal law. The Bankruptcy Court awarded summary judgment to the defendants, and Thomas appealed. Although Thomas styles her appeal as being based on four separate issues, the fundamental question is whether the Bankruptcy Court was correct in ruling that Mass. Gen. Laws ch. 183C was preempted by federal law, and therefore did not apply to her loan.

### III.     Analysis

Thomas essentially contends that the judgment of the Bankruptcy Court that she was not entitled to the protections of Mass Gen. Laws ch. 183C was incorrect. There are three steps to the Court's analysis in evaluating that contention:

(1) Is the application of Mass Gen. Laws ch. 183C to loans by federal thrifts preempted by federal law?

(2) If so, does that preemption extend to loans that were "table-funded" by a federal thrift? and

(3) Was her loan table-funded?

#### A.     Preemption of Mass. Gen. Laws. ch. 183C

Chapter 183C imposes certain requirements and mandates certain disclosures, beyond those otherwise required by state law, for mortgage loans that the statute defines as "high-cost loans." *See* Mass. Gen. Laws ch. 183C. Thomas contends that her May 2006 loan was a high-cost loan, entitling her to the protections of chapter 183C. She further contends that some of

those protections were not afforded to her, and that she is therefore entitled to recover for violations of chapter 183C.

The Bankruptcy Court found that chapter 183C and its protections had been preempted by the Home Owners' Loan Act of 1933, 12 U.S.C. §§ 1461–1468.  Upon *de novo* review, this Court agrees.

Congress enacted the Home Owner's Loan Act ("HOLA") in 1933.  It was intended "'to provide emergency relief with respect to home mortgage indebtedness' through 'a radical and comprehensive response to the inadequacies of the existing state systems.'" *Sovereign Bank v. Sturgis*, 863 F. Supp. 2d 75, 91 (D. Mass. 2012) (quoting *Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 159-60 (1982).  The Act allowed for the "charter[ing of] savings associations under federal law" that would be subject only to uniform, federal law.  *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008).  It authorized the promulgation of regulations providing for "the organization, incorporation, examination, operation, and regulation" of the federal savings associations and federal savings banks created by the act, which are collectively known as "federal thrifts."  *Fidelity*, 458 U.S. at 144.  Such regulations have since been promulgated by several offices, among them the Office of Thrift Supervision ("OTS").

Created in 1989, the OTS was given "broad authority under HOLA to regulate and govern 'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." *Sovereign Bank*, 863 F. Supp. 3d at 91 (quoting *Fidelity*, 485 U.S. at 145).  The Supreme Court has noted that it "would have been difficult for Congress to give the [OTS] a broader mandate." *Fidelity*, 485 U.S. at 161 (quoting *Glendale Federal Sav. and Loan*

*Ass'n v. Fox*, 459 F. Supp. 903, 910 (C.D. Cal. 1978).

Pursuant to this authority, the OTS promulgated 12 C.F.R. § 560.2. The regulation is "preemptive of any state law purporting to address the subject of the operations of a Federal savings associating." *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 535 (1st Cir. 2007). In relevant part, the regulation states that

> OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities . . . .

12 C.F.R. § 560.2. The regulation also provides an illustrative list of the types of state laws that are preempted, 12 C.F.R. § 560.2(b), and a list of exceptions to preemption, 12 C.F.R. § 560.2(c).[2]

The courts have adopted a two-step analysis to determine whether a particular state law is preempted by § 560.2. First, a court must determine if the law falls into a category under subsection (b) of the regulation. If it does, then "the analysis will end there; the law is preempted." *Sovereign Bank*, 863 F. Supp. 2d at 92 (quoting 61 Fed. Reg. 50951-01, 50966). If

---

[2] As the Bankruptcy Court noted, HOLA's preemption of state law has been limited by Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203 (2010). *Thomas II*, 476 B.R. at 695. The statute no longer completely occupies the field of banking regulation and its preemptive effect is now limited to specific conflicts between state and federal law. *Id.* However, the Dodd–Frank Act also provides that

> "[the statute] shall not be construed to alter or affect the applicability of any regulation, order, guidance, or interpretation prescribed, issued, and established by the Comptroller of the Currency or the Director of the Office of Thrift Supervision regarding the applicability of State law under Federal banking law to any contract entered into on or before the date of the enactment of this act[.]"

*Id.* (citing Dodd-Frank Act §§ 1044, 1046). Accordingly, because this transaction was consummated prior to the enactment of the Dodd-Frank Act, the changes to HOLA's preemptive effect are not applicable to this case.

the law does not fit into subsection (b), courts engage in a broader inquiry of whether the law "affects lending." *See id.* If the law affects lending, then it is presumptively preempted, unless it can clearly be shown to fit within the exemptions found in paragraph (c). *Id.*

Under that analysis, it appears beyond dispute that chapter 183C is preempted by federal law. The analysis ends at the first step, as the law falls within two of the categories set forth in subsection (b): state laws purporting to regulate loan regulated fees, and state laws purporting to regulate loan disclosures. 12 C.F.R. § 560.2 (b) (5) & (9). Chapter 183C regulates loan related fees by imposing restrictions on mortgage loans where the total points and fees charged in connection with the mortgage loan exceed a certain amount. And it forbids issuing a "high cost home loan" without first disclosing the borrower's right to credit counseling, meaning it is also a disclosure statute. OTS opinion letters have confirmed this interpretation by concluding that similar anti-predatory lending laws from several other states are preempted. *See* OTS Ltr. P-2003-2 (New York); OTS Ltr. P-2003-6 (New Mexico), OTS Ltr. P-2003-5 (New Jersey), and OTS Ltr. P-2003-1 (Georgia).

Thomas, nonetheless, contends that the determination that the law is preempted "do[es] not give credence to the expressed will of Congress as enacted in the Truth in Lending Act as codified at 15 U.S.C. § 1633." (Pl. Reply at 1). Like chapter 183C, the Truth in Lending Act ("TILA") requires various disclosures in connection with consumer credit transactions.[3] Individual states may apply for exemptions to the law, allowing their own state credit law to govern in state credit transactions. Massachusetts has received such an exemption. Appellant contends that because Congress has allowed states to be exempted from TILA, that more specific

---

[3] TILA has been amended since its enactment by the enactment of the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639, which provides protections similar to those required by Chapter 183C.

exemption should govern over the more general OTS regulation, and therefore supersede the preemptive effect of HOLA and 12 C.F.R. § 560.2.

In *Sovereign Bank v. Sturgis*, 863 F. Supp. 2d 75 (D. Mass. 2012), the appellant made a similar argument, contending that because Massachusetts had "opted-out" of TILA, state requirements that replaced the TILA requirements should not be preempted. The court rejected appellant's argument, and held that federal law applied. Because the court's analysis applies with equal force here, this Court will quote it at length:

> The Sturgises argue that the MCCCDA should not be preempted because its provisions are 'complementary' to the provisions of the federal Truth in Lending Act ("TILA") . . . They argue that because Massachusetts has "opted out" of TILA (so that the federal provisions have no force and the similar state requirements govern instead), the state requirements that replace TILA's provisions should not be preempted. If it were true that the Federal Reserve had exempted the transaction at issue from TILA so that the MCCCDA might govern, this argument might have some force. It would seem inequitable, and contrary to Congress's intent, if disclosure requirements would govern credit transactions involving federally chartered savings banks in most states, but where the federal government had explicitly chosen to depend on state regulation instead of TILA, HOLA would preempt that regulation and no disclosure requirements would be imposed at all. However, that is not the case here.
>
> TILA permits a state that has adequately regulated the area of credit disclosures with provisions that are 'substantially similar' to the federal law to apply for an exemption from the TILA requirements from the Federal Reserve. 15 U.S.C. § 1633; 12 C.F.R. § 226.29. In 1982, Massachusetts was granted such an exemption. [] However, the exemption does not apply to the transaction between Sovereign and the Sturgises. The Federal Register states:
>
>> Credit transactions subject to the Massachusetts Truth in Lending Act are exempt from chapters 2 and 4 of the Federal act. (The exemption does not apply to transactions in which a federally chartered institution is a creditor.)
>
> [48 Fed. Reg. 14882-01, 14890]. Sovereign is a federally chartered institution. The transaction in the instant case is therefore subject to TILA. Any additional protections offered by the MCCCDA are, under the OTS's analytical framework, preempted by HOLA.

8

*Sovereign Bank*, 863 F. Supp. 2d. at 95.

Just as the exemption in *Sovereign Bank* specifically indicated that it did not apply to transactions involving federally-chartered institutions, so does the exemption at issue here. The Massachusetts TILA exemption provides:

> [C]redit transactions that are subject to chapter 140D (Consumer Credit Costs Disclosures) of the General Laws of Massachusetts, established by chapter 733 of the Acts of 1981, and its implementing regulations are exempt from chapter 2 (credit transactions) and chapter 4 (credit billing) of the federal Truth in Lending Act. This exemption does not apply to transactions in which a federally chartered institution is a creditor.

47 Fed. Reg. 42,171 (Sept. 24, 1982). Thus, even if the exemption does apply to this type of claim, it cannot apply to any transaction in which the creditor is a federally chartered institution.

Accordingly, if Flagstar, a federal savings bank, is considered the "original lender" for purposes of TILA, then the Massachusetts TILA opt-out would not apply and the transaction would be governed by HOLA and other federal law. Appellant has admitted that if federal law applies to her loan, there would be no violation. *Thomas II*, 476 B.R. at 695.

### B. "**Table-Funding" and HOLA Preemption**

Although Thomas's loan closed in Allied's name, defendants contend that the loan was "table-funded," and that this process served to make Flagstar the original lender for purposes of the preemption analysis.

Generally, speaking, "table[-]funding means a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds." 24 C.F.R. § 3500.2 (1997). Although no reported case appears to address table-funding in the context of HOLA preemption, it has been addressed in other contexts. For

example, in *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558 (D. Md. 2009), the plaintiffs claimed that the defendants, through a subsidiary, had violated a Maryland finder's-fee law. The law barred the collection of a finder's fee for facilitating a mortgage transaction when a single company served as both the broker and the lender. The plaintiffs claimed that Wells Fargo had created a sham corporation, allowing it to collect finder's fees despite serving as both the broker and the lender. Although Wells Fargo was not the listed lender, table-funding was considered "lending" for the purposes of statutory violations. According to the court, if Wells Fargo had been assigned a loan by a "bona fide secondary market transaction," there would be no violation because it would not be serving as the lender.

Although there is no decision directly on point, the Court sees no reason why a bank table-funding a loan should not also be considered the original lender for purposes of HOLA preemption. On its face, the relevant OTS regulation gives federal savings associations the power to "extend credit as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities." §560.2. In a table-funded transaction, the table-funder is the one extending credit in every sense except name. The logic behind allowing federal savings associations to extend credit without regard to state laws would be thwarted by an alternative interpretation.

That interpretation is consistent with a number of agency interpretations in other contexts that have treated a bank or savings association that table-funds a loan as the original lender. For example, the Office of the Comptroller, addressing preemption under the National Bank Act, has taken the position that it "consider[s] a national bank that provides funding and takes assignment of a loan pursuant to a 'table funding' arrangement to be the 'lender' for purposes of preemption.

Comptroller of the Currency, Interpretive Letter # 1002 (May 13, 2004). The Department of Housing and Urban Development ("HUD") has also recognized that the true "lender" in a table-funded mortgage transaction is the funding entity, not the entity in whose name the loan closes. *See* 24 C.F.R. § 3500.2(b) (definition of "Lender"). For purposes of HUD regulations, in a table-funded transaction, "the lender is the person to whom the obligation is initially assigned at or after settlement." *Id.* In other words, the "lender" is the table-funding entity, not the entity in whose name the loan closes.

Thomas cites several cases that she claims support the proposition that table-funding is insufficient to make a federal savings association the original lender. *See, e.g., Au v. Republic State Mortgage Co.*, 2012 WL 6726384 (D. Haw. Dec. 27, 2012); *Brown v. Allied Home Mortgage Capital Corp.*, 2011 WL 3351532 (D. Md. Aug. 2, 2011); and *Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 530 (D. Md. 2011). However, in *Au*, the court suggested that table-funding was not even an issue in that case, stating that "Au no longer seeks to allege that Sand Canyon was the lender, and he no longer argues that the loan was "table-funded." *Id*. at *4.[4] *Brown* concerned an issue of contract law regarding Allied's attempt to compel arbitration; neither party advanced any argument as to who served as the true lender. And in *Minter*, although Thomas is perhaps correct in noting that "the determining factor [in the case] was stated to be the degree of independence and legitimacy of the named lender's operations," the case turned on whether the second entity *ever* served as an independent lender, or if it solely operated as a "front brokerage" for the true lender.

Accordingly, for purposes of HOLA preemption analysis, Flagstar will be considered the

---

[4] In fact, the decision suggests that the plaintiff was permitted to add his table-funding claims pursuant to a previous order but chose not to do so.

original lender, notwithstanding the fact that it may have only table-funded the loan.  There remains the question of whether Flagstar actually did so.

### C.     Flagstar Table-Funded Appellant's Loan

Although courts have differed slightly in their analysis of whether a loan was table-funded, the inquiry generally centers on the language of 24 C.F.R. § 3500.2—who provided the loan funding and who had the real interest in the loan.  The latter inquiry is sometimes phrased as a question of whether the alleged broker was obligated at the time of closing to assign the loan to the entity advancing the fund.

The Bankruptcy Court's findings of fact includes several facts that are relevant to the question of whether Flagstar provided the funding for the loan.  The court found that Flagstar approved the loan and issued a Rate Lock Confirmation and Purchase Commitment Letter; that the loan was subject to several conditions imposed by Flagstar; that the loan was transferred to Flagstar the same day it was executed; that appellant's first payment was due to Flagstar; that the note was assigned and delivered to Flagstar shortly thereafter, without recourse from Allied; and that Flagstar wired $148,763.18 to another bank in connection to the refinancing of the loan.  Although Thomas purports to contest many of these facts, she has not set forth sufficient evidence to demonstrate that the bankruptcy judge committed clear error in any of its findings.

The circumstances of the transfer of the loan from Allied to Flagstar are analogous to other loans that have been found to be table-funded.  In *Reagan v. Racal Mortgage, Inc.*, 135 F.3d 37 (1st Cir. 1998), for example, the court describes loans as table-funded where "a third party [] provided the funds that [the broker] lent to the plaintiffs; after the loans were closed, [the broker] immediately assigned the loans to [the lender]." *Id*. at 38.  Based on the undisputed

facts, the situation here was exactly that. Flagstar underwrote the loan, and after the loan closed Allied immediately assigned it to Flagstar. Accordingly, there is no genuine dispute of fact as to whether Flagstar table-funded the loan.

In short, Flagstar extended credit directly to Thomas. Thomas has shown no proof that Allied advanced the funds for the loan, nor has she provided any alternative explanation for the funds disbursed by Flagstar in connection with her loan.

Accordingly, the Bankruptcy Court's summary judgment order will be upheld.[5]

## IV.  Conclusion

For the foregoing reasons, the Order of the Bankruptcy Court dated August 27, 2012, is AFFIRMED.

**So Ordered.**

/s/ F. Dennis Saylor  
F. Dennis Saylor IV  
United States District Judge

Dated:  September 5, 2013

---

[5] The Court need not reach the issue of whether the Bankruptcy Court's citation to what Thomas contends is conflicting deposition testimony was reversible error.